## JACKSON S. POTTER *v.* RIDGE REALTY CORPORATION

SUPERIOR COURT       FAIRFIELD COUNTY       FILE NO. 133507

Memorandum filed October 7, 1969

*Andre L. Nagy,* of Bridgeport, for the plaintiff.

*Abram W. Spiro,* of Danbury, for the defendant.

FITZGERALD, J.   The within action was tried to the court at Danbury on September 10 and 11, 1969. It is one in which the plaintiff, a licensed real estate broker of Connecticut, is seeking to recover of the defendant corporation a commission which he alleges in his complaint, as amended by a more specific statement, was earned when he produced a customer, in the person of Robert H. Bayne, Jr., who was ready, willing and able to buy the defendant's real estate situated on Beaver Brook Road in Danbury for the price and upon the terms fixed by the defendant. By way of answer, the defendant denied all of the allegations contained in the plaintiff's complaint and more specific statement, thereby putting the plaintiff to his proof.

It can be found that the defendant corporation, through its president, Vincent DeFlumeri, in March, 1967, gave a general oral listing of the real estate in question to the plaintiff upon the following terms: Gross sales price $275,000, from which a commission of $20,000 was to be paid the plaintiff, or, conversely, net sale figure of $255,000 to the defendant exclusive of the plaintiff's commission of $20,000.

It can be found that on May 28, 1968, the plaintiff advised DeFlumeri over the telephone that Bayne was interested in buying the property and that an appointment was made for May 31, 1968, for DeFlumeri, Bayne and the plaintiff to meet on the property and for Bayne to inspect the interior of the

building, which was then in use as a girls' dormitory in connection with Western Connecticut State College in Danbury; it can be further found that Bayne, on May 31, after inspecting the property, was "willing" to acquire the property on the general terms submitted, providing that one or two contingencies or conditions be satisfied such as a satisfactory talk by him with the dean of women at the state college and agreed landscaping and cost of that project of a part of the grounds. The plaintiff's offers of proof, including his own testimony and that of Bayne—the college dean was not offered as a witness by the plaintiff—were vague in regard to these aspects. According to Bayne, either he or the defendant was to grade and seed a part of the grounds, the cost to be adjusted to the purchase price; it was his testimony that the college official with whom he did talk was a Dr. Burke, a personnel officer. The dean of women at the college was then Dean Gettes, a woman. DeFlumeri testified that Bayne never talked with Dean Gettes. It would appear that Bayne finally so conceded, his position being that a talk with either Dr. Burke or Dean Gettes sufficed. Again it is stated that terms concerning landscaping in the way of grading and seeding a part of the grounds, and who precisely would bear the cost of so doing, and the nature, scope and purpose of a talk with a college official by Bayne, and the part such would play in the final completion of the transaction between Bayne and the defendant, are all matters of sheer conjecture, surmise and speculation in the light of the evidence as a whole.

The foregoing finding in itself is sufficient to preclude the recovery of a commission by the plaintiff. But in fairness to the plaintiff, the court will explore and analyze the situation further, and from a standpoint apart and aside from the foregoing finding. There is no question that DeFlumeri, acting on be-

half of the defendant, knew from the plaintiff's telephone call to him on May 28 that Bayne was interested in buying the property in question; and, following the meeting on the property on May 31, DeFlumeri definitely knew that Bayne was not only interested in buying the property but indeed willing to do so. According to the plaintiff, it was on June 3 that DeFlumeri told him that the transaction was off; according to DeFlumeri, he so advised the plaintiff on June 1. Whether the latter date be June 1 or June 3 is of no particular moment, from what is said hereinafter.

The defendant has denied all of the allegations contained in the plaintiff's complaint as amended. The vital allegation at this point is: "That on May 28, 1968 [and from the testimony as a whole it would seem that May 31, 1968, would be the more appropriate date to allege, although this aspect is bypassed by the court], the plaintiff did procure a purchaser, namely, Robert H. Bayne, Jr., of Darien, Connecticut, who was ready, willing and able to purchase said premises for a gross purchase price of $275,000." It is the defendant's claim that the plaintiff has not sustained the burden of proof that Bayne at the required time was financially able to complete the transaction. Our Supreme Court has held that the fact that a customer produced by a broker is "ready and willing" to buy the defendant's property is not proof of the customer's "financial ability to complete the transaction." *Thomas F. Rogers, Inc.* v. *Hochberg,* 143 Conn. 22, 24.

The Connecticut rule, if not the universal rule, is this: "The general listing of property with a real-estate broker for sale, without special agreement, does not give rise to such mutual obligations as in themselves constitute a contract. 1 Mechem, Agency, § 31. Such a listing of property approximates rather

an offer by the owner, which he may withdraw at any time, but which ripens into a contract when the broker meets its terms by producing one who is able, ready, and willing to buy on the terms stated, or on terms satisfactory to the owner." *Skene* v. *Carayanis,* 103 Conn. 708, 713, and earlier Connecticut cases there cited. The rule still obtains in later Connecticut cases such as *Thomas F. Rogers, Inc.* v. *Hochberg,* supra; *Richter* v. *Drenckhahn,* 147 Conn. 496, 500; *Marshall* v. *Sturgess & Jockmus, Inc.,* 150 Conn. 59, 62. The same general rule is substantially stated in 12 Am. Jur. 2d, Brokers, § 183, first sentence, with copious citations of cases in footnote 1, page 923, from other jurisdictions in this country, including the Restatement (Second), 2 Agency § 445.

It was made to appear at the trial that the property in question was subject to a mortgage held by the New Milford Savings Bank in the then reduced amount of $200,000. Since the defendant was expecting to receive a net $255,000 for its property, the financial ability of Bayne to meet this situation, by having the New Milford Bank allow him to assume the mortgage and his securing additional money from other sources, was of prime importance. When asked on cross-examination as to his personal assets in May, 1968, the youthful Bayne, then twenty-seven years of age and with no prior business experience, testified that he had about $3000 in cash; that his wife's parents, who lived in Ohio, would help him out financially; and that a bank in Toledo, Ohio, might have been of assistance. The parents-in-law were not witnesses at the trial, and their ability to assist their son-in-law financially, and the amount of money so needed in this connection, remained a matter of speculation. The same observation applies in regard to the Ohio bank.

On cross-examination by Attorney Spiro, Bayne was asked this question: "I ask you again, is it so

or not that you were going to finance this purchase by assuming the mortgage held by the then existing mortgagee? A.—I can't remember whether I was going to go all cash or assume it or not. I think I assumed I was going to assume it." Subsequently, the court asked these questions of Bayne: "What bank held the mortgage? A.—It was the New Milford Bank, sir. I don't recall the name. Q.—Did I hear you say you had got to the point of going to the New Milford Bank and that was the bank that held this $200,000 mortgage, and asked an officer of that bank if they would permit you to assume the mortgage? A.—Whether I point blank asked him, I don't know. I assume I could from the way he talked."

It is to be noted that the plaintiff did not offer as a witness any official of the New Milford Savings Bank to testify that his bank would allow the mortgage of a then reduced principal amount of $200,000 to continue in force by Bayne's being permitted to assume it. So, also, nothing appears concerning the interest on that mortgage, concerning whether the bank would insist on a higher rate of interest if the mortgage was permitted to continue, and concerning Bayne's ability to pay and keep current any rate of interest. In the absence of the testimony of an official from the bank tending to support a finding that the existing mortgage could be assumed by Bayne, and in the absence of testimony by the parents of Bayne's wife that they were in a position to, and would, give all necessary financial assistance to Bayne in acquiring the property in question, with or without the assistance of a bank in Ohio, ready to help, the plaintiff has failed to establish by the required burden of proof one of the essential elements in his alleged cause of action, namely, Bayne's financial ability to complete his part of the transaction.

In *Murphy* v. *Brown,* 252 Iowa 764, 768, the Supreme Court of Iowa had this to say in regard to the term "able" in a real estate transaction to buy and sell property: "The term 'able' as used . . . [in this connection] ordinarily refers to financial ability. It is stated succinctly in 12 C.J.S., Brokers, section 85, page 193, in this language: 'Furthermore, the financial ability required of a customer, to entitle the broker producing him to a commission, is his ability to meet the terms of the sale . . . and is not necessarily solvency or ability to respond in damages.'" In *Morere* v. *Dixon Real Estate Co.,* 188 So. 2d 623, 627 (La. App.), the Court of Appeal of Louisiana had this to say in the same connection: "What constitutes ability to perform on the part of the proposed purchaser can involve a variety of circumstances. But, as used in the rule we are discussing, the word 'able' certainly includes a reference to financial ability not only to make the initial payment required to meet the terms of the seller but also to complete the contract of purchase according to its terms. When he is solely dependent upon third persons who are in no way bound to furnish those funds, a proposed purchaser is not, within the rule, 'able' to make the purchase." It would appear that even if the parents of Bayne's wife had in fact been shown to have had funds available to take over and assist in the transaction, entirely or in necessary part, Bayne still would not constitute the status of an "able" purchaser within the meaning of the rule. 12 Am. Jur. 2d 925, Brokers, § 184, last sentence, and citations in footnote 20.

At the trial, and in argument, counsel for the plaintiff contended that it was the burden of the defendant to prove affirmatively that the customer produced by the plaintiff broker lacked the financial ability to complete the contract, and not the burden of the plaintiff broker to prove affirmatively that the

customer produced by him had the financial ability to complete the contract. In *Ellsworth Dobbs, Inc. v. Johnson,* 50 N.J. 528, 548, the Supreme Court of New Jersey had this to say: "The principle that binds the seller to pay commission . . . regardless of the customer's financial ability, puts the burden on the wrong shoulders. Since the broker's duty to the owner is to produce a prospective buyer who is financially able to pay the purchase price and take title, a right in the owner to assume such capacity when the broker presents his purchaser ought to be recognized. It follows that the obligation to inquire into the prospect's financial status and to establish his adequacy to fulfill the monetary conditions of the purchase must be regarded logically and sensibly as resting with the broker. . . . In reason and in justice it must be said that the duty to produce a purchaser able in the financial sense to complete the purchase at the time fixed is an incident of the broker's business . . . ."

Further discussion is not required. It would appear that, when viewed from every conceivable aspect, the plaintiff broker has not established a case against the defendant warranting a recovery of a broker's commission. And this is so notwithstanding the fact that it was the defendant corporation, acting by and through DeFlumeri, its president, which terminated on either June 1 or June 3, 1968, any pending agreement it may be said to have had with Bayne concerning the latter's purchase of the property in question. This is because the plaintiff broker failed to establish by the requisite proof that Bayne on the date of termination of the agreement by DeFlumeri was financially able to complete the transaction. That Bayne was willing to do so, and ready in a qualified sense to do so *(Thomas F. Rogers, Inc. v. Hochberg,* 143 Conn. 22, 24) does not satisfy the requirement of his financial ability to complete the

transaction. This is an element, proof of which is essential to the plaintiff's alleged cause of action. The plaintiff has failed in this respect to establish a right of commission.

Judgment is required to be entered for the defendant, with taxable costs in its favor as an incident of the judgment.