**A.L. GREEN & COMPANY, INC. and Meridian Properties, Inc., Plaintiffs,**

v.

**The GREAT–WEST LIFE ASSURANCE COMPANY, GWL Properties, Inc., and Great–West Life & Annuity Insurance Company, Defendants.**

No. C–C–89–340–P.

United States District Court, W.D. North Carolina, Charlotte Division.

June 12, 1990.

William R. Culp, Jr., Culp Underwood Elliot & Marsh and J. Mitchell Aberman, James McElroy & Diehl, P.A., Charlotte, N.C., for plaintiffs.

F. Joseph Treacy, Jr. and Lori S. Stephens, Petree Stockton & Robinson, Charlotte, N.C., for defendants.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on the Defendants' Motion for Summary Judgment, filed February 12, 1990. After the Defendants filed the Motion for Summary Judgment, the Plaintiffs filed a Brief in Opposition to the Defendants' Motion. The Defendants responded by filing a Reply Brief. The Plaintiffs then filed a Surreply Brief. Both the Plaintiffs and the Defendants have presented the Court with deposition transcripts, affidavits, and numerous documentary exhibits.

To assist the Court in disposing of the Defendants' Motion for Summary Judgment, and upon the Defendants' request, the Court conducted a hearing on May 15, 1990, to listen to the parties' oral arguments. At the hearing, the Plaintiffs were represented by Mitchell J. Aberman, and

William R. Culp, Attorneys at Law. The Defendants were represented by F. Joseph Treacy, Jr. and David L. Ormand, Jr., Attorneys at Law.

## I. FACTUAL BACKGROUND

Plaintiff A.L. Green & Company, Inc. (hereafter "A.L. Green"), acting through Mr. A.L. ("Buddy") Green, and Plaintiff Meridian Properties, Inc. (hereafter "Meridian"), acting through Mr. Richard L. Sigmon, are real estate brokerage firms seeking to recover $74,250.00 allegedly earned by them as commissions. The Plaintiffs are seeking to recover under four separate claims for relief: (1) breach of contract; (2) quantum meruit; (3) breach of an implied duty of good faith and fair dealing; and (4) prevention.

Defendant Great–West Life & Annuity Insurance Company (hereafter "Great–West Annuity") and Defendant GWL Properties, Inc. (hereafter "GWL") both are wholly-owned subsidiaries of Defendant Great–West Life Assurance Company (hereafter "Great–West Assurance"). Great–West Annuity owned an apartment complex in Myrtle Beach, South Carolina, known as Carolina Ridge Apartments Phase I and Phase II (hereafter "the Property"). GWL acted as an agent for Great–West Annuity in negotiating and consummating the sale of the Property in August 1988 to Singleton Enterprises, Inc. (hereafter "Singleton"). Mr. Eric Bell was an officer and representative of GWL.

In 1988, Fleet Funding Corporation, through Mr. Fred D. ("Bubba") Ross, Jr., assisted Great–West Annuity in screening potential purchasers of the Property and in gathering pertinent information regarding potential purchasers. In June or July 1988,

Meridian's Sigmon informed Ross that Sigmon and a co-broker, A.L. Green, knew a potential purchaser for the Property. The potential purchaser was SYNCO, Inc. (hereafter "SYNCO"). Sigmon inquired whether Ross would protect the Plaintiffs' interests as brokers and pay them three percent of the negotiated sales price. Ross conferred with Great–West Annuity and, on July 15, 1988, telephonically informed Sigmon that Great–West Annuity would pay the Plaintiffs a three percent sales commission. According to Sigmon's deposition testimony, the commission would not be paid to the Plaintiffs, however, until Great–West Annuity fully accepted an offer for the Property brought forward by the Plaintiffs.

Although the Defendants agreed to pay the Plaintiffs a sales commission under certain circumstances, the Plaintiffs and the Defendants then failed to execute a written sales commission agreement. According to the deposition testimony of Green and Sigmon, the only written expression of the sales commission agreement was contained in a proposed contract for the purchase of the Property subsequently tendered by SYNCO.[1]

As of July 27, 1988, Bell of GWL had informed Sigmon that GWL already had received a competing offer on the Property which Great–West Annuity was considering. The competing offer was from Singleton. Sigmon, however, informed Bell, by a letter dated July 27, 1988, that Meridian would continue to seek an offer from SYNCO for the purchase of the Property until such time as the Defendants committed to another purchaser.

On August 2, 1988, Sigmon, Green, and Elizabeth Dula, a Vice–President of SYN-

---

1. Statements by Sigmon and Green in their affidavits filed subsequent to their depositions which contradict their deposition testimony will not defeat the Defendants' motion for summary judgment. In *Barwick v. Celotex Corp.*, the United States Court of Appeals for the Fourth Circuit stated as follows:

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment

as a procedure for screening out sham issues of fact. *Perma Research and Development Co. v. Singer*, 410 F.2d 572, 578 (2d Cir.1969). A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct. *Radobenko v. Automated Equipment Co.*, 520 F.2d 540, 544 (9th Cir.1975).

*Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.1984).

CO, met with Ross in Ross' office in Columbia, South Carolina and presented Ross a written offer from SYNCO to purchase the Property. SYNCO's offer was in the form of an unexecuted, proposed contract. SYNCO's offer to GWL contained a paragraph providing that SYNCO and Great–West Annuity had not dealt with any broker "... in connection with this transaction except for A.L. Green & Company and Meridian Properties" and that Great–West Annuity would pay the brokers a three percent commission at closing. SYNCO also tendered $25,000 as an earnest money deposit. Using a facsimile machine, Ross transmitted SYNCO's offer to Bell at Bell's office in Englewood, Colorado. On the same date, Sigmon and Green telephonically confirmed the sales commission agreement with Bell. The parties, however, still had not executed a written sales commission agreement. On August 3, 1988, Bell, acting on behalf of Great–West Annuity, rejected SYNCO's offer because it contained unacceptable terms.

On August 5, 1988, Singleton tendered another, and second, offer to GWL. Bell made plans to meet with Singleton representatives in Nashville, Tennessee on August 11, 1988. Bell left Colorado on August 10, 1988, negotiated with Singleton on August 11, 1988, and agreed on August 11, 1988, to sell the Property to Singleton.

Sometime between August 3, 1988, and August 8, 1988, Dula of SYNCO contacted Bell to discuss changing the unacceptable terms of SYNCO's first offer. According to Dula's affidavit, Bell said that if SYNCO would agree to three specific changes in the original offer, Bell would accept SYNCO's written contract and that Bell stated, "If you make the changes, we have a deal." In her affidavit, Dula states that as a result of her conversation with Bell, she acquired SYNCO's approval of the proposed changes and revised the original, rejected offer. SYNCO's revised contract contained the following language in paragraph 21(d):

(i) *Acceptance.* The submission of this contract by Buyer to Seller *constitutes an offer* which shall become null and void unless Seller has executed all four (4) originals and returned two (2) fully

executed, sealed and acknowledged originals to Buyer before 5:00 p.m. Eastern Daylight Savings Time on August 15, 1988. (emphasis added).

On August 9, 1988, Dula unsuccessfully attempted to contact Bell by telephone. *Dula,* therefore, informed Bell's secretary that "we have a deal." Dula also left instructions for Bell to call her.

When Bell did not return Dula's telephone call, Dula on August 10, 1988, telephoned Mr. David Thomson, President of Great–West Assurance. At 4:11 p.m. Eastern Time on the same date, Dula forwarded via facsimile machine to Mr. Thomson "for [his] review an updated contract for the purchase of Carolina Ridge Apartments." The "updated contract" of August 10, 1988, was not signed by SYNCO. The August 10, 1988 "updated contract" contained a paragraph providing that SYNCO and Great–West Annuity had not dealt with any broker "... in connection with this transaction except for A.L. Green & Company and Meridian Properties" and that Great–West Annuity would pay the brokers a three percent commission at closing. In her affidavit, Dula states that SYNCO was ready, willing, and able to purchase the Property on the terms of the contract forwarded to Great–West Assurance and required by GWL.

According to Bell's affidavit, SYNCO's revised offer of August 10, 1988 was received in Englewood, Colorado during Bell's absence from the office. Bell was not aware that SYNCO's August 10, 1988 offer had been received until his return from Nashville, Tennessee on August 12, 1988. By that time, however, Bell had agreed to sell the property to Singleton. Neither SYNCO nor Green nor Sigmon communicated with either Bell or GWL between August 12, 1988 and August 14, 1988. According to Bell's affidavit, no one authorized to accept a purchase contract on the Property ever accepted a purchase contract from SYNCO. In his affidavit, Bell states that SYNCO's revised offer of August 10, 1988, which Dula had transmitted by facsimile machine, contained unacceptable terms. On August 15, 1988, Bell

rejected SYNCO's revised offer, as so designated in paragraph 21(d) of the document, and returned the earnest money deposit. Great–West Annuity subsequently closed the sale to Singleton on August 25, 1988.

## II. THE COURT'S STANDARD FOR SUMMARY JUDGMENT

The Court's standard for considering motions for summary judgment is clear. Summary judgment is appropriate when the pleadings, responses to discovery, and the record reveal that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of showing that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). After the moving party has met its burden, the nonmoving party must come forward with specific facts showing that evidence exists to support its claims and that a genuine issue for trial exists. *Id.; Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see* F.R.Civ.P. 56(e) (in response to motion for summary judgment, "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). When considering motions for summary judgment, courts must view facts and inferences from the facts in the light most favorable to the party opposing the motion for summary judgment. *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57; *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). When, however, the evidence from the entire record could not lead a rational fact-finder to find for the non-moving party, no genuine issue for trial exists and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

## III. DISCUSSION

■ Under North Carolina choice of law rules, courts determine the validity and interpretation of a contract by referring to the state in which the contract was formed. *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 261 S.E.2d 655, 656 (1980). The place where the last act essential to a meeting of the minds occurred is the place in which the contract was formed. *Nytco Leasing, Inc. v. Dan–Cleve Corp.*, 31 N.C.App. 634, 230 S.E.2d 559, 563 (1976), *rev. denied*, 292 N.C. 265, 233 S.E.2d 393 (1977). Contract issues involving performance and damage for nonperformance, however, are governed by the laws of the place of performance. *Burnick v. Jurden*, 306 N.C. 435, 293 S.E.2d 405, 410 (1982). The parties apparently agree, and the Court finds, that South Carolina law is the appropriate law to apply in this case. South Carolina is the place in which Ross, as an agent for GWL, and Sigmon formed the sales commission agreement. The performance of the agreement also was to occur in South Carolina because the Property was located in South Carolina and the ultimate transfer to SYN-CO, if it occurred, would have taken place and been recorded in South Carolina.

### A. The Plaintiffs' Claim for Breach of Contract

■ Under South Carolina law, a broker ordinarily earns his commission when the broker procures a purchaser *who is accepted by the seller of the property and with whom the seller enters into a valid and enforceable contract. Dantzler Real Estate, Inc. v. Boland*, 276 S.C. 275, 277 S.E.2d 705, 706 (1981) (emphasis added); *Cass Co. v. Nannarello*, 274 S.C. 326, 262 S.E.2d 924, 926 (1980); *Thomas–McCain, Inc. v. Siter*, 268 S.C. 193, 232 S.E.2d 728, 729 (1977); *Champion v. Whaley*, 280 S.C. 116, 311 S.E.2d 404, 406 (S.C.Ct.App.1984).

■ In this instance the Plaintiffs never procured a purchaser *who was accepted by Great–West Annuity, the seller, and with whom Great–West Annuity entered into a valid and enforceable contract.*

Relying on *Thomas–McCain, Inc. v. Siter,* the Plaintiffs argue that in states, including South Carolina, adopting the majority rule, a broker is entitled to a commission even if the buyer fails to consummate the sale. *See Thomas–McCain,* 232 S.E.2d at 729. In *Thomas–McCain,* the court succinctly stated the facts as follows:

> The property in question was listed with the Broker by the Seller, and it is undisputed that the Seller and the Purchaser were brought together through the efforts of the Broker. The Broker contends that its services were fully performed and that its right to the commission vested *when the Seller accepted the Purchaser and entered into a valid and binding contract of sale.* The Seller maintains that under the terms of the contract the Broker was not to receive any compensation until the consummation of the sale.

*Thomas–McCain,* 232 S.E.2d at 729 (emphasis added). The *Thomas–McCain* court then recognized the majority rule that "a broker has earned his commission when he procures a purchaser who is accepted by the owner of the property and with whom the latter, uninfluenced by any representation or fraud on the part of the broker, enters into a valid and enforceable contract, and that such right to compensation will not be defeated by the failure or refusal of the purchaser to consummate the contract." *Id.*

This Court agrees with the general and majority rule recognized by the *Thomas–McCain* court. The facts in *Thomas–McCain,* however, are clearly distinguishable from the facts in the case at bar. The majority rule cited by the court in *Thomas–McCain,* therefore, does not control the resolution of the dispute before this Court. In the case before the Court, SYNCO had not signed, and Great–West Annuity had not accepted, the "updated contract" sent by Dula on August 10, 1988. SYNCO and Great–West Annuity, thus, had not entered into a valid and enforceable contract. Quite obviously, the situation in which the seller has accepted the purchaser and entered into a valid and binding contract of sale is entirely different from the situation in which the seller never has accepted the purchaser and never has entered into a valid and binding contract of sale. The undisputed facts in the case before this Court illustrate the latter situation.

Under South Carolina law, for a contract for the sale of real property to be enforceable, the contract must be in writing and must be signed by the seller of the property. S.C.Code Ann. § 32–3–10. It is undisputed that Great–West Annuity never signed a written contract for the sale of the Property. According to the specific language in paragraph 21(i) of SYNCO's document transmitted via facsimile machine on August 10, 1988, the document itself constituted an offer. Thus, no written, valid, and enforceable contract ever existed between Great–West Annuity and SYNCO that would entitle the Plaintiffs to a brokerage commission.

■ Relying on *Benya v. Gamble,* the Plaintiffs argue that the seller can enforce a contract binding against a purchaser even if the seller has not executed the contract. The court in *Gamble* stated that:

> A contract exists where there is an agreement between two or more persons upon sufficient consideration either to do or not to do a particular act. The essentials of a contract include an offer *and acceptance.*

*Benya v. Gamble,* 282 S.C. 624, 321 S.E.2d 57, 60 (S.C.Ct.App.1984) (citations omitted) (emphasis added). Thus, the *Gamble* court emphasizes and reiterates the basis of this Court's decision, i.e. before a contract can exist, there must be an offer *and acceptance* and, thus, a meeting of the minds.

In the case at bar, *if* SYNCO had signed the "updated contract" *and if* Great–West Annuity had accepted SYNCO's "updated contract," a contract between Great–West Annuity and SYNCO would have existed. The Plaintiffs, then, would have been entitled to a commission regardless of whether the transaction closed because Great–West Annuity could have enforced the contract, as the *Gamble* decision holds. However, SYNCO had not signed the "updated contract" and Great–West Annuity simply nev-

er accepted the "updated contract" sent by Dula on August 10, 1988. The Plaintiffs have not produced any evidence showing a meeting of the minds or a contract signed by both Great–West Annuity and SYNCO.

Having reviewed the record and viewing the facts in a light most favorable to the Plaintiffs, the Court believes that no genuine issue of material fact exists on the Plaintiffs' claim for breach of contract. The Court concludes, therefore, that the grant of summary judgment in the Defendants' favor on the Plaintiffs' breach of contract claim is appropriate.

### B. Plaintiff's Claim for Quantum Meruit

 Under South Carolina law, a plaintiff attempting to recover under a theory of quantum meruit must prove three essential elements: (1) That the plaintiff conferred a nongratuitous benefit on the defendant; (2) that the defendant realized the benefit so conferred; and (3) that the defendant retained the benefit under conditions that make it inequitable for him to retain the benefit without paying its value. *Webb v. First Federal Savings & Loan Ass'n*, —— S.C. ——, 388 S.E.2d 823, 825–26 (S.C.Ct.App.1989); *Niggel Assoc., Inc. v. Polo's of North Myrtle Beach, Inc.*, 296 S.C. 530, 374 S.E.2d 507, 509 (S.C.Ct.App. 1988). A nongratuitous benefit is a benefit conferred either at the request of the defendant or in circumstances under which the plaintiff reasonably relies on the defendant to pay for the benefit and the defendant understands or ought to understand that the plaintiff expects compensation and will look to the defendant for compensation. *Niggel Assoc.*, 374 S.E.2d at 509. South Carolina courts have recognized, however, that if a contract exists, a plaintiff cannot recover on the theory of quantum meruit. *See Strickland v. Coastal Assoc. Inc.*, 294 S.C. 421, 365 S.E.2d 226, 228 (S.C.Ct.App.1987) (recognizing well-settled rule that one can recover under theory of quantum meruit unless contract is in force); *see also* 12 C.J.S. *Broker* § 196 (1980); 66 Am.Jur.2d *Restitution and Implied Contracts* § 83 (1973).

Both the Plaintiffs and the Defendants essentially have argued that a sales commission agreement existed. The Court concludes, consequently, that if a valid, enforceable sales commission agreement between the Plaintiffs and the Defendants exists, the Plaintiffs cannot avail themselves of the theory of quantum meruit as a basis for relief.

The Court believes, on the other hand, that if a valid enforceable sales commission agreement fails to exist and, accordingly, the Plaintiffs can rely on the theory of quantum meruit, the Plaintiffs cannot establish a prima facie case. In attempting to establish a factual issue regarding their grant of a benefit on the Defendants, the Plaintiffs rely on Sigmon's affidavit. In paragraph 14 of his affidavit, Sigmon states that "Mr. Singleton told me that he had to increase his price to purchase the subject property because of the price that was procured from SYNCO." In this way, the Plaintiffs have attempted to establish, first, that because of SYNCO's interest in the Property, Singleton was required to raise the price that it paid to the Defendants for the purchase of the Property and, second, that the Plaintiffs' efforts in representing SYNCO conferred a benefit on the Defendants. The Court is of the opinion that Sigmon's statement is hearsay and inadmissible. The Court, therefore, will order paragraph 14 of Sigmon's affidavit stricken from the record and will not consider it. Consequently, no admissible evidence exists to establish that the Plaintiffs conferred any benefit upon the Defendants. The Court concludes, consequently, that taken in the light most favorable to the Plaintiffs, the evidence now in the record does not allow the Plaintiffs to establish an essential element of their prima facie case.

 Even assuming that the Plaintiffs can establish a prima facie case, the Court is firmly convinced that the evidence from the entire record could not lead a rational fact-finder to find for the Plaintiffs on their quantum meruit claim. The Court believes, first, that no rational fact-finder would conclude under these circumstances that the Plaintiffs conferred a nongratuitous benefit on the Defendants at the Defendants'

specific request. Instead, it appears that the Plaintiffs first approached Ross, who was acting as an agent for GWL. Moreover, after learning in July 27, 1988, of a competing offer for the purchase of the Property, the Plaintiffs informed GWL that they would continue to proceed with their efforts to procure SYNCO as a purchaser for the Property. No evidence exists to establish that the Defendants requested the Plaintiffs to perform, or to continue performing, the services of a broker in either of these instances.

■ The Court believes, second, that no rational fact-finder would conclude from the circumstances evident in the record that the Plaintiffs reasonably relied on the Defendants to pay for a nongratuitous benefit or that the Defendants understood or ought to have understood that the Plaintiffs expected compensation and would look to the Defendants for compensation. The Plaintiffs did not have an exclusive listing arrangement for the sale of the Property. The Plaintiffs knew that GWL was seeking other, competing offers for the Property and that GWL already had received at least one other competing offer for the purchase of the Property. After learning of the receipt by GWL of a competing offer, the Plaintiffs informed GWL that they would continue to proceed with their efforts to procure SYNCO as a purchaser for the Property. The Court concludes, therefore, that no rational fact-finder would determine that under these circumstances, it would be inequitable for the Defendants to retain any nongratuitous benefit without paying its value.

Viewing the facts and the inferences from the facts in a light most favorable to the Plaintiffs, the Court finds, accordingly, that no genuine issue of material fact exists on the Plaintiffs' quantum meruit claim. The Court concludes, therefore, that the Defendants are entitled to the entry of summary judgment in their favor on the Plaintiffs' quantum meruit claim.

### C. The Plaintiffs' Claim for Breach of Implied Covenant of Good Faith and Fair Dealing

■ South Carolina law imposes on parties to a contract the implied duty of good faith and fair dealing. *Commercial Credit Corp. v. Nelson Motors, Inc.*, 247 S.C. 360, 147 S.E.2d 481, 484 (1966). When a party's contractual obligation is contingent on a unilateral determination that another party's performance under the contract is satisfactory, the unilateral determination must not be made arbitrarily and must be based on reasonable grounds. *Deering Milliken Research Corp. v. Textured Fibres, Inc.*, 310 F.Supp. 491, 499 (D.S.C.1970).

Obviously, the Defendants were not *required* to accept any offer submitted by the Plaintiffs on SYNCO's behalf. The Defendants have shown arguably reasonable grounds for not accepting SYNCO's contract offered on August 10, 1988. The Defendants claim, and have produced evidence showing, that although SYNCO's offer for the purchase of the Property was higher than Singleton's offer, SYNCO's offer contained numerous conditions and contingencies that were unacceptable to Great–West Annuity. In his affidavit, Bell states that in his best business judgment, the Singleton contract was a better offer than the SYNCO offer.

The Plaintiffs, on the other hand, have no admissible evidence of any bad faith on the part of Great–West Annuity, as the seller of the Property, or any of the other Defendants. *The Plaintiffs did not engage in any discovery.* Instead, the Plaintiffs base their claim of bad faith on one other instance in which they had a dispute with the Defendants concerning a sales commission and contend as follows:

Why were the Defendants willing to take a lower price to prevent the Plaintiffs from being paid their commission? Unless the Defendants are simply irrational, their actions can only be explained by one of two answers.

1. The Defendants have a corporate policy against paying brokerage commissions; or

2. Someone associated with the Defendants received improper consideration in order to influence the decision of the Defendants.

The Plaintiffs submit that either of these explanations constitutes bad faith on the part of the Defendants. Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgement [sic], filed February 26, 1990, at 30–31. The Plaintiffs, however, have produced absolutely no admissible evidence to substantiate either of these contentions. The Plaintiffs' contentions regarding the Defendants' bad faith are based on mere speculation, not on admissible evidence.

■ The Court is of the opinion that no genuine issue of material fact regarding the Defendants' alleged bad faith exists and, consequently, that the Defendants are entitled to the grant of summary judgment in their favor on the Plaintiff's bad faith claim. All of the following facts are set out in Bell's affidavit filed with the Defendants' Motion for Summary Judgment. The Plaintiffs have failed to dispute any of these facts with admissible evidence. The Court believes that the following list of *undisputed* facts would lead a rational fact-finder to conclude only that the Defendants lacked bad faith.

According to his affidavit, Bell advised Sigmon on July 27, 1988, that he already had received an offer to purchase the Property, which offer Great–West Annuity was considering. Bell rejected SYNCO's August 2, 1988 offer because of several unacceptable terms. On August 5, 1988, Bell received in his office both a written offer from Singleton to purchase the Property and an earnest money deposit. On August 8, 1988, Bell made arrangements to meet with Singleton in Nashville, Tennessee on August 11, 1988, to continue the negotiations on Singleton's written offer to purchase the Property which Bell had received on August 5, 1988. On August 10, 1988, Bell left his office in Englewood, Colorado around mid-day to travel to Nashville. On August 11, 1988, Bell reached an agreement with Singleton and shook hands on the deal. Bell did not see SYNCO's revised August 10, 1988 offer until August 12, 1988, when he returned to his office in Englewood, Colorado. According to his affidavit, Bell still found that SYNCO's re-vised August 10, 1988 offer still contained unacceptable terms. No one associated with the Defendants ever accepted SYNCO's revised offer. Again, all of these facts are undisputed and contained in the record.

Taking all these facts and inferences from the facts in a light most favorable to the Plaintiffs, the Court believes that no genuine issue of material fact exists. The Court concludes, consequently, that the grant of summary judgment in the Defendants' favor on the Plaintiffs' third claim for relief is appropriate.

### D. Plaintiffs' Claim for Prevention

South Carolina courts have recognized the theory of prevention in connection with brokers' claims for sales commissions allegedly earned. *See Champion v. Whaley,* 280 S.C. 116, 311 S.E.2d 404, 406 (S.C.Ct. App.1984). In *Champion v. Whaley,* the buyer of real property had entered into a valid and enforceable written contract with the seller, subject to the buyer obtaining a 100% loan from the Farmers Home Administration (FmHA). *Id.,* 311 S.E.2d at 405. Before the closing had taken place, the seller sold the property to another buyer, who changed the locks on the doors and would not allow the appraiser for FmHA to enter the house. *Id.* The broker then filed suit to collect his commission. *Id.* At trial, the trial court nonsuited the broker, who subsequently appealed. *Id.*

On appeal, the South Carolina Court of Appeals recognized that a broker suing for commissions allegedly due ordinarily must prove that any conditions precedent to the seller's duty to pay commissions have been fulfilled. *Id.,* 311 S.E.2d at 406. The *Champion* court acknowledged, however, that if the seller prevents a condition precedent from occurring, the condition is excused and the seller's obligation to pay becomes unconditional. *Id.* The court in *Champion* noted that in an action on a contract, a party who has prevented a contractual condition from occurring cannot rely on the other party's nonperformance on the contract. *Id.* The *Champion* court found that the evidence admitted at trial

raised an issue of fact for the jury on the issue of whether the seller had prevented the closing of the sale and, therefore, reversed the trial court's nonsuit. *Id.*

The facts in the case before the Court, however, are totally different from the facts in *Champion.* In the case at bar, the Defendants never had accepted SYNCO's offer and never had entered into a valid and enforceable contract with SYNCO, the potential buyer of the Property. No rational fact-finder, therefore, could conclude that the Plaintiffs were entitled to prevail under the theory of prevention.

The Court finds, therefore, that in reference to the Plaintiffs' claim for prevention, no genuine issue of material fact exists. The Court concludes, consequently, that the Defendants are entitled to the entry of summary judgment in their favor on the Plaintiffs' final claim for relief.

### IV. CONCLUSION AND ORDER OF THE COURT

After a thorough review of the Defendants' Motion for Summary Judgment, the Plaintiffs' Brief in Opposition, the Defendants' Reply, the Plaintiffs' Surreply, and all of the affidavits, deposition transcripts, and documentary exhibits, the Court concludes that the Defendants are entitled to summary judgment in their favor on all of the Plaintiffs' claims for relief.

NOW, THEREFORE, IT IS ORDERED that (1) paragraph 14 of Sigmon's Affidavit, filed February 26, 1990, be, and hereby is, STRICKEN from the record; (2) the Defendants' Motion for Summary Judgment be, and hereby is, GRANTED in reference to all of the Plaintiffs' claims for relief; (3) the Plaintiffs shall have and recover nothing of the Defendants on any of their claims for relief; and (4) the Plaintiffs' Complaint be, and hereby is, DISMISSED WITH PREJUDICE IN ITS ENTIRETY.